**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANNEL SALGADO, individually, on behalf of themselves and all others similarly situated, | Case No. 1:25-cv-06061 |
| *Plaintiff,* | |
| v. | |
| A1 DEVELOPMENT, LLC, d/b/a NO LIMIT COINS, | |
| *Defendant.* | |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Jannel Salgado ("Plaintiff"), individually and on behalf of all others similarly situated, hereby alleges the following against Defendant A1 Development, LLC, d/b/a No Limit Coins ("Defendant" or "No Limit Coins"), based upon, *inter alia*, the investigation made by her counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon her personal knowledge.

**NATURE OF THE CASE**

1.      This case arises out of Defendant's operation of an illegal online gambling platform that it markets as a "free" "social casino," but in reality, is an unlicensed casino prohibited under New York law.

2.      Defendant owns and operates one of the most popular and profitable online gambling websites on the planet called No Limit Coins ("No Limit Coins"), available at https://www.nolimitcoins.com.

3.      In No Limit Coins, users can access and play thousands of popular, traditional casino-style games, including, *inter alia*, slots, jackpots, and other games of chance (the "Chance

1

Games").

4.      The Chance Games are, undoubtedly, games of chance and are no different than if they were played in a Las Vegas casino. Their outcomes are determined primarily, if not exclusively, by randomization—rendering them indistinguishable from the games found in traditional, brick-and-mortar casinos.

5.      While Defendant has branded No Limit Coins as a harmless "social casino," that label is nothing more than a misleading marketing tactic to deceive regulators and consumers into believing it offers harmless gameplay instead of unlawful gambling.

6.      In practice, No Limit Coins players can buy chips, gamble and cash out for rewards—just like at a regular casino. Indeed, No Limit Coins owes its overwhelming success to its authentic casino gaming experience, including games from a myriad of reputable gaming studios, generous bonus programs, and diverse, fast-paying banking options.

7.      No Limit Coins generates revenue when players purchase its in-game currency, which are tokens that allow consumers to play the games offered on Defendant's website.

8.      No Limit Coins sells packages of virtual currency to consumers. These packages include two forms of currency: Gold Coins (purportedly for free play) and Super Coins (redeemable for cash or monetary prizes). Gold Coins are a standard in-game currency, which No Limit Coins offers with a generous sign-up bonus and daily refills ensuring ongoing access.

9.      No Limit Coins claims that its Gold Coins are recreational play that have no real-world value. But what it does not tell its customers is that it bundles the Gold Coins offer with Super Coins, which is another form of currency with monetary value.[1] This is the true nature of its business model.

---

[1]   https://deadspin.com/sweepstakes-casinos/reviews/nolimitcoins/ (last accessed October 24, 2025).

10.     To participate in sweepstakes games with the potential to win real prizes, players use Super Coins. After fulfilling a 1x playthrough requirement and accumulating a minimum of 10,000 Super Coins, players can redeem them for cash prizes through payment methods like PayPal or bank transfers. Alternatively, with a minimum of 2,500 Super Coins, players can redeem for gift cards.[2] In short, a user playing games using Super Coins is gambling in the purest sense— they are wagering something of value (Super Coins) on a random event with the hope and intent of winning more Super Coins than wagered.

11.     Defendant's pricing structure confirms that the true purpose of these transactions is to sell Super Coins. Notwithstanding the differences between the coins, none of the games depend on any amount of skill to determine their outcome.

12.     Virtual gambling is highly addictive and strictly regulated in New York. By law, these games can only be offered by licensed operators in licensed, physical locations. New York prohibits gambling that involves risking something of value, including virtual coins that can be redeemed for cash or prizes. Defendant's operations flout these legal requirements by providing unlicensed gambling services to New York residents via its Chance Games.

13.     Plaintiff, individually and on behalf of all other similarly situated, seeks damages, restitution, and declaratory and injunctive relief to stop Defendant's unlawful conduct.

## PARTIES

14.     At all times material hereto, Plaintiff has been a resident and citizen of New York, and is domiciled in Suffolk County, New York.

15.     Defendant is a company formed and existing under the laws of Wyoming, with its

---

[2]  https://www.players.org/sweepstakes-casinos/nolimitcoins/?utm_  (last accessed October 24, 2025).

headquarters and principal place of business at 571 S Washington, Afton, WY 83110. Upon information and belief, all of Defendant's members are citizens of the State of Wyoming. Accordingly, for purposes of diversity, Defendant is considered a citizen of Wyoming. 28 U.S.C. § 1332(c)(1). A1 Development LLC owns and operates a gambling website (available at https://www.nolimitcoins.com/) and app under the brand "No Limit Coins." A1 Development LLC conducts business within the venue of this District and throughout New York generally, which website, apps and operations are not permitted and are illegal under New York law.

<u>**JURISDICTION AND VENUE**</u>

16.     This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d), this Court has subject matter jurisdiction because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the proposed Class is comprised of at least 100 members, and (3) complete diversity exists between at least one plaintiff and one defendant.

17.     This Court has personal jurisdiction over Defendant because it conducts substantial business and directs its activities into this District, including activities that form the basis for the claims here, and a substantial part of the acts and omissions complained of occurred in this District.

18.     Moreover, Defendant actively disseminates targeted advertisements within the state with the intent of promoting and selling its products and services to consumers there. As such, Defendant does business with sufficient minimum contacts in New York.

19.     Defendant has purposefully directed its activities toward this District.

20.     Defendant has purposefully availed itself of the privileges of conducting activities in this District.

21.     Defendant's claim arises out and relates to Defendant's forum-related activities.

22.    The exercise of jurisdiction over Defendant is reasonable.

23.    Upon information and belief, Defendant localizes its game for each market where it is distributed, including the United States.

24.    Upon information and belief, Defendant has sold millions of dollars of virtual items to thousands of New York residents, most of which are repeat purchases by the same customers, by contracting with the customers to sell virtual coins and other goods in exchange for legal tender.

25.    No Limit Coins facilitates ongoing economic activity between thousands of New York players and Defendant.

26.    Upon information and belief, Defendant directly controls whether consumers in New York can complete purchases from No Limit Coins.

27.    Upon information and belief, Defendant has the capability to determine where its customers are from, including whether purchases are being made from New York.

28.    Upon information and belief, Defendant has the capability to prevent New York residents from completing purchases or placing wagers in No Limit Coins but has chosen to accept those purchases and wagers from New York residents. For example, other gambling applications prevent transactions from residents of states where gambling is unlawful.

29.    Upon information and belief, Defendant has taken no steps to restrict New York residents' access to No Limit Coins or to restrict the ability of New York residents to make purchases from No Limit Coins.

30.    Upon information and belief, Defendant distributes its No Limit Coins app, in part, via the Apple app store and Google play store.

31.    Upon information and belief, in order to distribute No Limit Coins via the Apple app store and Google play store, Defendant entered into a developer agreement with Apple and

Google.

32.    Defendant aggressively advertises No Limit Coins in the United States, including in this District. Those advertisements include linear media, social media advertisements and advertisements in other mobile applications.

33.    Upon information and belief, these advertisements for No Limit Coins were designed and directed to attract consumers in the United States, including this District, to play No Limit Coins.

34.    Upon information and belief, Defendant has the capability of targeting its No Limit Coins advertisements by geography and the capability of excluding residents of New York from the reach of Defendant's advertisements for No Limit Coins.

35.    Upon information and belief, Defendant partners with Meta Platforms, Inc., to serve targeted online ads at users of other companies' websites, games and online services. Upon information and belief, these ads are targeted at players that Defendant identifies as potentially interested in No Limit Coins, including residents of New York. Upon information and belief, Defendant utilizes unique device identifiers and Google Advertising ID and IP addresses in connection with these targeted ads. This information allows Defendant to identify the geographic location of its ad targets, including whether they are in New York.

36.    Upon information and belief, Defendant has taken no steps to restrict its advertisements for No Limit Coins from reaching residents of New York.

37.    Upon information and belief, in addition to Apple and Google, Defendant has entered into development agreements with Amazon for the distribution of No Limit Coins app, which has offices in this New York. Upon information and belief, under each of those agreements, Defendant has accepted responsibility for the compliance of No Limit Coins with federal and state

laws, including those of New York.

38.     Venue is proper in this District under 28 U.S.C. §1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District. All of Plaintiff's activities and losses in No Limit Coins occurred in this District.

39.     In addition, venue is proper in this District under 28 U.S.C. §1391(b)(1) and § 1391(b)(3), in that Defendant is subject to this Court's personal jurisdiction.

40.     Plaintiff alleges, upon information and belief, that Defendant conducts professional and commercial activities in New York on a substantial, continuous, and systematic basis and therefore Defendant is subject to the general jurisdiction of the courts of this state.

41.     Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to each of the Defendant's professional and commercial activities within New York, and therefore the Defendant is subject to the specific jurisdiction of the courts of this state.

## FACTUAL BACKGROUND AND COMMON ALLEGATIONS

### I.     *The Problem of Online Gambling*

42.     Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including so called "social casinos."

43.     Since the Supreme Court's 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[3] This proliferation has been accompanied by a

---

[3]   https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_ (last accessed October 24, 2025).

dramatic rise in gambling addiction cases.[4]

44.     Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[5] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[6]

45.     Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[7]

46.     Further, internet searches for help with gambling addiction, such as "am I addicted to gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[8]

47.     The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general

---

[4] *See id.*

[5]    https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/#:~:text=The%20National%20Council%20on%20Problem%20Gambling%20estimates%20that%20about%202.5,of%20callers%20is%20skewing%20younger. (last accessed October 24, 2025).

[6] https://www.who.int/news-room/fact-sheets/detail/gambling#:~:text=A%20Swedish%20study%20estimated%20that,the%20general%20population%20(4) (last accessed October 24, 2025).

[7] https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/     (last accessed October 24, 2025).

[8]    https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_ (last accessed October 24, 2025).

population.[9] Online platforms, including social casinos, have been identified as significant contributors to this trend. These platforms often employ addictive design features, such as near-miss outcomes, fake limited-time sales, and variable reinforcement, to keep users engaged.

48.    The addiction and fallout related thereto is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains insufficient.

## II.    *New York law prohibits Sweepstakes Casinos and Online Gambling*

49.    New York generally prohibits all commercial gambling, with limited exceptions. *See* N.Y. Const. art. I, § 9; Gen. Oblig. L. § 5-401. This prohibition reflects the State's strong public policy against online gambling. *See Ramesar v. State*, 224 A.D.2d 757, 759, 636 N.Y.S.2d 950 (1996) (noting New York's "[p]ublic policy continues to disfavor gambling.").

50.    In New York, gambling occurs when a person "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." N.Y. Penal Law § 225.00(2).[10] Both physical casinos in New York and virtual casinos that are made available to New Yorkers online are subject to these laws. *See, e.g.*, *People v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 846 (Sup. Ct. N.Y. Cty. 1999).

51.    New York's statutory definition of "something of value" is expansive and includes:

> any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a

---

[9] https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last accessed October 24, 2025).

[10] The Penal Law imposes no criminal liability on individual bettors, focusing instead on bookmakers and other operations, like Defendant, that advance or profit from illegal gambling activity. *See, e.g.*, N.Y. Penal Law § 225.10.

service, entertainment or a privilege of playing at a game or scheme without charge.

N.Y. Penal Law § 225.00(6).

52.     Defendant blatantly disregards New York's clear prohibition on gambling. As discussed further below, the No Limit Coins platform allows users to purchase and wager "Super Coins"—digital currency that, like chips in a brick-and-mortar- casino, can be redeemed for real money—on games of chances, including slot machines, jackpot games, and other casino-style offerings.

53.     Indeed, a user that wagers Super Coins on the spin of a virtual slot machine is "stak[ing] or risk[ing] something of value"—Super Coins—"upon the outcome of … a future contingent event not under his control"—the results of the slot machine spin—"upon an agreement or understanding that he will receive something of value in the event of a certain outcome"— namely, more Super Coins, which can be redeemed for money or prizes.

54.     Critically, virtual coins, such as Super Coins, which are both sold to players and exchangeable for money or prizes, plainly constitute "something of value." This is true regardless of whether any particular coin was purchased directly or obtained as part of a bundle or promotion. Thus, No Limit Coins' virtual casino games fall squarely within the ambit of New York's anti-gambling laws.

55.     The New York Attorney General's Office recently confirmed that "[o]nline sweepstakes casinos are illegal, dangerous, and can seriously ruin people's finances."[11] According to the Attorney General, "New York law prohibits online platforms from offering gambling that involves risking something of value, including virtual coins that can be redeemed for cash or

---

[11]     *See*     https://ag.ny.gov/press-release/2025/attorney-general-james-stops-illegal-online-sweepstakes-casinos (last accessed October 24, 2025).

prizes."[12]

56.    Attorney General James emphasized that sweepstakes casinos "are not subject to audits and other regulatory oversight by the state to ensure that games are not rigged, putting New Yorkers at risk."[13]

57.    Likewise, the Chairman of the New York State Gaming Commission, Brian O'Dwyer, explained that these "so-called 'sweepstakes' games are unscrupulous, unsecure, and unlawful."[14]

58.    New York State Senator Joseph Addabbo, Jr. described sweepstakes casinos as "prohibited, unregulated, and unenforceable gambling entities" that "not only put individuals at risk of fraud and financial exploitation, but … also create dangerous pathways for gambling addiction, especially among minors."[15]

59.    On June 6, 2025 Attorney General James announced that her office has stopped online sweepstakes casinos operating in New York. No Limit Coins was shut down in New York as a result of a cease and desist letter sent from the Attorney General's office.[16]

### III.    *Defendant Uses Free "Social Gaming" as a Pretext for Real, Online Gambling.*

60.    No Limit Coins advertises itself as a "social casino" that is "free to play" to avoid gambling regulations and reassure potential players that it offers casino-style games purely for

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16]   https://ag.ny.gov/press-release/2025/attorney-general-james-stops-illegal-online-sweepstakes-casinos (last visited October 24, 2025)

entertainment, without real-money stakes. No Limit Coins claims it is a "free" play casino. No Limit Coins prominently represents that it is a **"PLAY-FOR FUN WEBSITE INTENDED FOR AMUSEMENT PURPOSES ONLY. NOLIMITCOINS SOCIAL GAMING PLATFORM DOES NOT OFFER 'REAL-MONEY GAMBLING' OR OPPORUNTIY TO WIN REAL MONEY BASED ON A GAMEPLAY."** (emphasis added). This false representation misleads consumers, including Plaintiff, into believing that they are participating in harmless gameplay rather than actual-money gambling, even when wagering with Super Coins. In doing so, Defendant enables users to engage in real-money gambling through its system of Super Coins, deceiving consumers into believing they are participating in harmless gameplay when, in fact, they are wagering something of value for the chance to win tangible prizes.

61.    The app offers a multitude of digital slot machines and other forms of lottery wheel. Through No Limit Coins, Defendant offers the chance to win sweepstakes prizes by accumulating ostensibly redeemable Super Coins.

62.    Players can access No Limit Coins either through the internet website or on Apple and Android devices in the United States through the App Store and Play Store, respectively.

63.    Once a player creates a No Limit Coins account, they receive a bonus of 100,000 Gold Coins and can choose to either "play for fun" or "play with [Super Coins]."

64.    When players log onto the website, they are met with rows of games to choose from, including slots and jackpot games. Here is an example of one of Defendant's slot games:



65.    Before playing a game, players must select their play mode (either Gold Coins or Super Coins) by clicking the option in the top-right corner of the website.





66.     Once a mode is selected, games allow players to wager the corresponding type of coin. Depending on the outcome of the spin, a player may earn more coins. Defendant makes it easy to switch between wagering the two Coins. This simple mechanism is designed to make it as convenient as possible for players to transition gambling with real-world stakes. Players who start out having fun can quickly and effortlessly shift to risking actual money without fully appreciating the financial consequences.



67.     In short, the slots and other games of chance offered on the website are gambling, and they are no different than if they were played in a Las Vegas casino.

68.     The app is accessible and made available to New York residents.

69.     Consumers visiting the gaming app for the first time are awarded an allocation of free Gold Coins.  Consumers also receive Gold Coins through promotional giveaways and other marketing efforts.

70.     Consumers also may use Super Coins to play games. Super Coins may be redeemed for cash prizes and gift cards. Upon information and belief, one Super Coin is equal to $1USD in prizes. In other words, "Super Coins" is a proxy for real money.

71.     Consumers can receive Super Coins in multiple ways, including by purchasing specifically marked packs of Gold Coins, promotions, participating in giveaways, or completing daily missions. The most common way, however, for users to obtain Super Coins is to purchase Gold Coins (*i.e.*, the more Gold Coins a user purchases, the more Super Coins the user receives as a bonus).  So, in effect, when a person buys Gold Coins, they are also generally buying Super Coins, though Defendant falsely markets the sale as Super Coins being an added "bonus" added to the purchase.



72.     Players then gamble using Super Coins that they would play with Gold Coins.  In short, a user playing the chance-based games with Super Coins is gambling in the purest sense – they are wagering something of value on a random event with the hope and intent of winning more Super Coins than wagered to then receive tangible rewards, prizes, and value.

73.     Plaintiff and, upon information and belief, the vast majority of players on the Defendant's platform regularly buy additional coin bundles when they run out of Super Coins even when they already possess unused Gold Coins. The fact that players are making these repeated purchases when they have ample Gold Coins confirm that these transactions are driven entirely by the desire to obtain Super Coins for real-money gambling, rather than for the Gold Coins that Defendant sells.

74.     Users may acquire Super Coins through various means, including promotional giveaways, participation in contests or daily missions, and most commonly, through the purchase of Gold Coins. The more Gold Coins a user buys, the more Super Coins they receive as an alleged "bonus." In reality, Defendant uses the sale of Gold Coins as a vehicle for the sale of Super Coins, misleadingly marketing the transaction to obscure the real-money nature of the exchange.

75.     Once obtained, users gamble with Super Coins in the same manner as they do with Gold Coins. However, because Super Coins are redeemable for real-world value, users who wager Super Coins are engaging in gambling: staking something of value on an event determined predominantly by chance with the expectation of winning additional value in the form of redeemable prizes.

76.     Furthermore, Defendant imposes a "1x playthrough" requirement on bonus Super Coins, mandating that players must wager an amount equal to the number of bonus Super Coins they wish to withdraw before any redemption is permitted. For example, to withdraw 25 Super

Coins, a player must first wager at least 25 Super Coins on casino-style games offered through the No Limit Coins platform. This restrictive condition significantly impairs users' ability to redeem winnings and effectively forces continued gambling activity. The playthrough requirement operates as a coercive mechanism, compelling users to risk further losses under the guise of accessing previously earned rewards. This practice is misleading, particularly when users are initially lured to the platform by representations that it is merely a "social casino" offering free-to-play entertainment. In reality, the platform's design systematically incentivizes and prolongs gambling behavior while obscuring the difficulty of actually obtaining monetary rewards— underscoring the predatory nature of Defendant's operations.

77.    In New York, it is illegal to operate and offer online gambling casinos, including, like here, websites that offer slot machines, jackpots, and poker. *See* N.Y. Const. art. I, § 9; N.Y. Gen. Oblig. L. § 5-401. In this regard, New York has a fundamental and deep-rooted public policy against gambling.

78.    Despite New York's clear prohibition on online gambling, Defendant operates unlicensed and illegal online casinos within New York, as discussed further below.

79.    Players of No Limit Coins stake or risk "something of value" when playing any of the games of chance offered on Defendant's website. Specifically, players use Super Coins to play various casino-style games, many of which are determined predominantly by chance rather than skill. When Super Coins are used, players risk these coins for the opportunity to win additional Super Coins, which can ultimately be redeemed for cash-value prizes. If a player wins, they retain and often multiply the coins they staked; if they lose, those coins are forfeited. This distinguishes No Limit Coins from traditional video games, where a user expends in-game currency or tokens to play regardless of the outcome. In No Limit Coins, players either maintain and grow their

balance, or lose it, based on the results of chance-based games, closely resembling the mechanics of real-money gambling.

80.    Under New York law, a game of chance is any "contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." N.Y. Penal Law § 225.00(1); *see also White v. Cuomo*, 38 N.Y.3d 209, 228, 192 N.E.3d 300 (2022) (holding that the Constitutional prohibition on gambling reaches "the staking of value on a game in which the element of chance predominates over the element of skill[.]").

81.    While No Limit Coins's games require some level of user interaction, chance is the predominant factor in determining outcomes. Specifically, in slot machines and other casino-style games featured on the site, the results are driven by random number generators or other chance-based mechanics. Upon information and belief, these outcomes are not influenced by player skill or strategy, but instead by algorithms designed to introduce randomness. As a result, the element of chance materially impacts the result of each game and thus, Defendant's games fall squarely within New York's statutory prohibitions.

82.    The slight degree of user interaction does not remove No Limit Coins's games from the definition of games of "chance" or "contest of chance" under New York law. Numerous games widely recognized as gambling, such as blackjack and craps, involve user interaction. User interaction is also a known feature in real-world slot machines. No Limit Coins is akin to real world casino games known as "I-Slots" or interactive slots, which are recognized forms of gambling that allows players to influence the outcome through choices and gameplay.[17]

---

[17] BetMGM, *Slots and the World of Narrative Gaming*, https://casino.betmgm.com/en/blog/islots-narrative-gaming/ (last accessed October 24, 2025); SDLC Corp., *How Slot Games Are Incorporating Interactive Features and Mini-Games*; https://sdlccorp.com/post/how-slot-games-are-incorporating-interactive-features-and-mini-games/ (last visited Dec. 31, 2024);

83.     Even players with extensive experience or knowledge of casino-style games may lose repeatedly if the game's underlying randomization is not in their favor. Conversely, less experienced users may win when the randomized outcomes align advantageously. This inherent unpredictability reinforces that chance, rather than skill, is the dominant factor in the outcome of No Limit Coins's games.

84.     The Gold Coins and Super Coins in No Limit Coins are things of value under New York law, because they provide an "extension of a service, entertainment or a privilege of playing a game or scheme without charge" and are considered "any representative of value" to players.

85.     The games in No Limit Coins have all the same trappings as casino games, such as slot machines, including graphics and sounds.

86.     Defendant's game design deliberately replicates the hallmarks of licensed, chance-based casino games to create an authentic gambling experience. From spinning reels and celebratory animations to jackpot symbols and dynamic sound effects, all of the games provided on Defendant's platforms evoke the same psychological triggers that drive gambling behaviors in brick-and-mortar casinos.

87.     In sum, Defendant's No Limit Coins casino platforms host casino-style games that are unmistakably games of chance. By offering these games of chance, Defendant is operating unregulated online casinos in violation of New York law, which explicitly prohibits gambling on games of chance conducted over the internet. N.Y. Gen. Oblig. L. § 5-401; N.Y. Penal Law §

---

https://lcb.org/articles/i-slots (last accessed October 24, 2025); Casino Life, *The Different Types of Online Slots & Their Features*; https://www.casinolifemagazine.com/blog/different-types-online-slots-theirfeatures#:~:text=I%2DSlots%2C%20or%20interactive%20slots,outcome%20through%20choices%20and%20gameplay (last accessed October 24, 2025).

225.00(1).

## IV.    *The Dual Currency System*

88.    Defendant attempts to circumvent this prohibition of online gambling—and similar in other states—by branding their casino games as free to play , so-called "sweepstakes" games. The core of Defendants' "sweepstakes" casino model is a dual currency system deliberately designed to obscure the fact users are engaging in real-money gambling. Players on No Limit Coins are introduced to two types of virtual currency: Gold Coins which purportedly hold no monetary value and are marketed as being solely for entertainment purposes, and Super Coins, which can be redeemed for real money at an exchange rate to the U.S. Dollar and serve as the gateway to Defendant's illegal gambling operations.



89.    Gold Coins are presented as the primary currency for casual gameplay. Players can earn a limited number of Gold Coins through daily logins or promotions and then must purchase more Gold Coins to keep playing. Defendants emphasize that Gold Coins are non-redeemable in an effort to support their claim that their games are "free-to-play." However, Defendant bundles

these purchases with Super Coins, which can be used to wager on the same casino-style games as Gold Coins.

90.    While Defendants insists that the game is free to play, this is incredibly misleading. It is true that players can obtain a limited number of Super Coins as bonuses for one-time "promotions," such as by initially signing up to use Defendants' services, completing an onerous mail-in request to obtain Super Coins, or linking the player's Facebook account. But the only way a player would even know about these "free" methods of obtaining Super Coins is if they found Defendant's Terms and Condition Rules — which are not conspicuously linked anywhere in the casino games—and combed through the fine print. In fact, the only advertised way of obtaining Super Coins is to purchase bundled packages of Gold Coins and Super Coins.



91.    When a player runs out of Gold Coins, they are prompted to purchase more in a bundled package with Super Coins.  Defendants characterize these transactions as primarily Gold Coin purchases with Super Coins supposedly included as a "free" bonus. However, the pricing structure makes it clear that players are actually paying for Super Coins. Here are some examples of how the pricing structure incentivizes users to purchase Gold Coins for the purposes of obtaining Super Coins:







92.     Upon information and belief, players can make purchases using Visa, Mastercard, and Alipay.



93.     Defendant's dual currency structure transforms what appears to be innocuous gaming platforms into unregulated online casinos where players use real money to gamble on games of chance. Courts throughout the country have found that when players spend money to obtain more "entries" or "bonus currency" despite already possessing unused amounts of the purported product (here, Gold Coins), there is unmistakable evidence that the "sweepstakes" or "promotion" is merely a front for gambling.

**V.     Defendant Resurrects Internet Sweepstakes Café Model from Early 2000s**

94.     In the early 2000s, a widespread trend emerged in which unscrupulous operators attempted to circumvent state gambling laws by establishing so-called "Internet cafés." These businesses—often set up in suburban strip malls—purported to sell innocuous products such as internet access or long-distance calling minutes. In reality, the purchase of those goods was merely a front for what amounted to casino-style gambling: customers received "free" sweepstakes entries with each purchase, which they could then use to play slot machine-style games on computer terminals, with the chance to win real cash prizes.

95.     Most state gambling statutes define gambling as involving three core elements: (1)

consideration**,** (2) chance, and (3) a prize**.** Operators of these Internet cafés attempted to sidestep the "consideration" element by claiming that the sweepstakes entries were promotional add-ons to legitimate purchases, akin to promotional sweepstakes run by brands like large brands. But this separation was illusory; the primary and intended purpose of the transaction was to enable gambling.

96.    Courts and law enforcement agencies across the United States uniformly concluded that these so-called sweepstakes promotions were thinly veiled gambling operations, and moved to shut them down under applicable state gambling laws.

97.    Defendant now attempts to revive this discredited model. Defendant will urge the Court to accept the fiction that its operations are not gambling, but rather legal "sweepstakes" entertainment. That argument is not new—it is the same tactic employed by illegal gambling outfits in the early 2000s, which courts and regulators uniformly rejected.

98.    As detailed herein, Defendant employs a structurally identical business model: users ostensibly purchase "virtual coins" but receive "Super Coins"—with real-world value—for use in casino-style games of chance. The inclusion of token "free" methods of entry and the marketing language around "sweepstakes" do not change the underlying legal reality. Courts have consistently found such models to be unlawful.

99.    Indeed, in *Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076 (W.D. Wash. 2024), a federal court granted summary judgment against an online gaming operator whose structure mirrored Defendant's.

100.    Defendant's attempt to rebrand illegal online gambling as a sweepstakes promotion is part of a familiar pattern already discredited by courts, regulators, and the public. Defendant's operations are not novel—they are a modern replica of a failed and unlawful model.

**VI.**    *Defendant Offers Gambling Without Statutory Consumer Protections*

101.    The harm inflicted through this dual currency system is further exacerbated by Defendant's lack of accountability and regulatory oversight. Unlike licensed casinos, which must comply with strict requirements to ensure fairness, transparency, and consumer protections, Defendant operates without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

102.    Defendant's online casino actively undermine critical consumer protections required by New York law. For example, Defendant allows anybody over the age of 18 to gamble on its casino platforms in complete disregard for the laws prohibiting individuals under the age of 21 to gamble in New York. *See, e.g.*, N.Y. RAC. PARI- MUT. WAG. & BREED. LAW § 1332(1) ("No person under the age at which a person is authorized to purchase and consume alcoholic beverages shall enter, or wager in, a licensed gaming facility"); N.Y. COMP. CODES R. & REGS. TIT. 9, § 5313.2(b) ("A gaming facility licensee shall post signs that include a statement that is similar to the following: 'It is unlawful for any individual under 21 years of age to enter or remain in any area where gaming is conducted. It is unlawful for any individual under 21 years of age to wager, play or attempt to play a slot machine or table game. Individuals violating this prohibition will be removed and may be subject to arrest and criminal prosecution.' Such signs shall be posted prominently at each entrance and exit of the gaming floor."); § 5313.2(c) ("A gaming facility licensee shall identify and remove any person who is under 21 years of age and not otherwise authorized by law to be on the gaming floor and immediately notify onsite commission staff when a person under 21 years of age is discovered on the gaming floor, in areas off the gaming floor where gaming activity is conducted or engaging in gaming-related activities."); § 5329.19(a) ("No

person under 21 years of age may place a wager with a casino sports wagering licensee").

103.    Defendant also disregards the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. COMP. CODES R. & REGS. TIT. 9 § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (877-8-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the commission."); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.1(b) ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from all New York State licensed gaming facilities."); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements.").

**VII.    *Defendant Deceptively Markets No Limit Coins as a "Free-to-Play Social Casino" to Lure Consumers In and Obscure the True Nature of Its Illegal Gambling Operations***

104.    Defendant markets its online platform as a "social" casino to lure consumers to wager on games of chance under the guise of "free" play and harmless entertainment.

105.    For example, No Limit Coins prominently describes itself as a "Free-to-play social casino" and misleadingly states "no purchase necessary."  It boasts a vast array of offerings, inviting consumers to play a plethora of different games of chance. No Limit Coins' website messaging is designed to entice players with promises like, "24/7 FREE," "100% free, always," and "No strings, no pressure. Just log in, play, and enjoy the ride – it's all about having fun, anytime you want, for free."  As shown below, Defendant's homepage leverages advertisements designed to captivate users with promises of "free" play on its "social casino" platform.



106.    These carefully crafted messages and branding strategies are intended to obscure the true nature of No Limit Coins as unlicensed online casino where players wager real money through a deceptive system of "free" gameplay and misleading rewards. No Limit Coins markets

itself as a "free-to-play social casino," while at the same time encouraging consumers to engage in what amounts to real-money gambling.

**FACTS SPECIFIC TO PLAINTIFF**

*Plaintiff's Experience*

107.    In response to Defendant's online advertising and representations described above, and under the belief that she was playing harmless and "free" social gaming, Plaintiff played No Limit Coins from approximately 2023 to March 2025 during which she made many in-game purchases of Super Coins.

108.    Plaintiff accessed No Limit Coins from her residence in New York. Plaintiff received an initial allotment of Gold Coins and Super Coins. After losing her initial allocation of free Gold Coins and Super Coins, she began purchasing Super Coins from Defendant and did so from New York, which Defendant accepted.

109.    Plaintiff placed all or substantially all of her wagers in No Limit Coins in New York.

110.    Overall, Plaintiff wagered and lost, at least, hundreds of dollars in real-world currency while using No Limit Coins and its games of chance, including slots with the goal of winning real cash prizes. She lost the coins she purchased from Defendant by wagering them in No Limit Coins's games of chance.

111.    By and through No Limit Coins's gambling features described above, Plaintiff was induced into making certain in-game purchases and wagers that she otherwise would not have made.

112.    As a result of Defendant's unfair, unlawful, and deceptive acts, Defendant was unjustly enriched.

**CLASS ALLEGATIONS**

113.    Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of herself and all others similarly situated defined as follows:

114.    The Class is defined as follows:
**New York Class**: All New York residents who, during the applicable limitations period, have lost money wagering on Defendant's online casino games.

115.    Excluded from the Class is: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

116.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identifies are unknown to Plaintiff currently but may be ascertained from Defendant's books and records and other third-party sources.

117.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a.    Whether the games in No Limit Coins are gambling as defined under New York law;

b.    Whether Defendant engaged in the conduct alleged in the Complaint;

c.    Whether Defendant violates the statutes listed below in Counts I, II, and III;

d.    Whether Defendant violated statutes analogous to those alleged herein applicable;

e.    Whether and how Defendant manipulates the odds in games offered in No Limit Coins;

f.    Whether Plaintiff and the other Class members were damaged by Defendant's conduct; and

g.  Whether Plaintiff and the other Class members are entitled to restitution or other relief.

118.    **Typicality**. Plaintiff's claims are typical of the claims of the Class because they were players of No Limit Coins who made in-game purchases of coins and wagered such coins as a result of Defendant's unlawful and wrongful conduct. The factual and legal basis of Defendant's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Defendant's unlawful and wrongful conduct.

119.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

120.    **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the proposed Class to individually seek redress for Defendant's wrongful conduct.

121.    **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

**FIRST CAUSE OF ACTION**
**Violation of the New York Loss Recovery Act**
**N.Y. Gen. Oblig. L. § 5-419**
***(On Behalf of Plaintiff and the New York Class)***

122.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–121 by reference as if fully set forth herein.

123.    Plaintiff brings this count individually and on behalf of the New York Class under New York General Obligation Law § 5-419, which was enacted to effectuate the State's public policy against unlawful gambling.

124.    All forms of unlicensed gambling—including wagers, bets, or stakes—based on games of chance are unlawful in New York. N.Y. Gen. Oblig. L. § 5-401.

125.    Section 5-419 of the Loss Recovery Statute provides: "Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not." N.Y. Gen. Oblig. L. § 5-419.

126.    Accordingly, this provision of the Loss Recovery Statute prohibits a person or entity from profiting from gambling activity—whether or not they are the actual "winner" of the wager or bet—and permits the person who paid or lost the money to recover it from the recipient.

127.    Defendant's casino games solicit "wager[s] or bet[s] prohibited" because they invite users to play games of chance (e.g., online slot machines) for money or other things of value (Super Coins), which constitutes illegal gambling under both New York civil and penal law. *See* N.Y. Gen. Oblig. L. § 5-401 ("All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event

whatever, shall be unlawful."); N.Y. Penal Law § 225.00 (defining "gambling" as the "stak[ing] or risk[ing] something of value upon the outcome of a contest of chance" and defining "gambling device," as "any device, machine, paraphernalia or equipment which is used or usable in the playing phases of any gambling activity, whether such activity consists of gambling between persons or gambling by a person involving the playing of a machine."); N.Y. Penal Law §§ 225.05225.10 (making advancing and profiting from unlawful gambling a misdemeanor or felony).

128.    Defendant's Super Coins constitutes money or a thing of value because its value is directly tied to the U.S. Dollar ratio. Just like casino chips in a brick-and-mortar casino, Super Coins serves as a proxy for real currency, allowing players to wager, win, and ultimately cash out their balances in a form that retains actual monetary value.

129.    Defendant's online casino platform is an Internet site and app that permits consumers to play games of chance (e.g., online slot machines) for money or other things of value (Super Coins).

130.    Every casino game offered on Defendant's online platform is a "gambling device" because they accept money or other valuable items (Super Coins) from players, operate on chance using random number generators, and enable players to stake, hazard, and bet money or other valuable items (Super Coins) with the potential to win or lose money or other valuable items (Super Coins).

131.    Defendant's games of chance do not permit players to gamble directly against other players. Rather, like the "house" in a traditional brick-and-mortar casino, Defendant is the "winner" under the statute because it has a direct stake in the result of the gambling. When players wager Super Coins on games of chance and win, they can redeem their winnings for real prizes in

U.S. Dollars—meaning Defendant incurs the equivalent monetary loss. Conversely, when players bet Super Coins on games of chance and lose, Defendant retains the full value of the lost Super Coins, just as traditional casinos profit from losing bets placed against the house.

132.    Defendant is also a "stakeholder" under this provision of the Loss Recovery Statute because, on information and belief, the money wagered by Plaintiff and the New York Class on Defendant's Chance Games was delivered or deposited into accounts owned or controlled by it.

133.    By purchasing, wagering, and losing Super Coins on Defendant's casino platform, Plaintiff and each member of the New York Class gambled and lost money or things of value.

134.    Defendant owns, operates, and controls the gambling games described herein, and directly profited from Plaintiff's and the New York Class members' gambling losses. Defendant is therefore the "winner" under N.Y. Gen. Oblig. Law § 5-419 of all moneys lost by Plaintiff and the New York Class members.

135.    Defendant operates an illegal gambling website that is accessible in New York.

136.    Plaintiff's and the New York Class members' losses occurred in New York because Defendant's online casino games were played by New York residents on computers, mobile phones, and mobile devices in the State of New York. Defendant had actual knowledge that Plaintiff and the New York Loss Class members reside in New York because each of them selected "New York" as their state of residence and provided their complete home address pursuant to Defendant's mandatory registration process.

137.    Plaintiff, on behalf of herself and the New York Class members, seeks an order requiring Defendant to (1) cease the operation of its gambling business, and (2) return all lost monies, with costs, pursuant to N.Y. Gen. Oblig. Law § 5-419.

**SECOND CAUSE OF ACTION**
**Violation of New York General Business Law § 349 (Deceptive Acts and Practices)**
*(On behalf of Plaintiff and the New York Class)*

138.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–121 by reference as if fully set forth herein.

139.    New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York. N.Y. Gen. Bus. Law § 349(a).

140.    N.Y. Gen. Bus. Law § 349 applies to Defendant's actions and conduct as described herein because it is a broad consumer protection statute that prohibits recurring deceptive acts or practices in business transactions, including those involving the marketing and sale of goods or services to New York consumers.

141.    Plaintiff and the members of the New York Class are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

142.    Defendant engaged in consumer-oriented conduct by marketing No Limit Coins as a "free" "social casino," while concealing the fact that its platform constitutes unlawful gambling with real financial risks.

143.    Indeed, Defendant markets its website and mobile application as a "Free-to-play social casino" and repeatedly represents that "no purchase [is] necessary," "24/7 FREE," "100% free, always," and "no strings, no pressure—just log in, play and enjoy the ride." These representations are materially misleading because consumers are induced to spend real money to obtain in-game currency required to continue playing or to participate in Defendant's games of chance that award redeemable real money prizes. In truth, Defendant's platform is not "free," as meaningful participation and extended play depend on the monetary purchase of Super Coins, and

the advertised "free" coins are insufficient to engage in the promoted gameplay or sweepstakes.

144.    Further, Defendant represents to consumers, including Plaintiff, that it is a **"PLAY-FOR FUN WEBSITE INTENDED FOR AMUSEMENT PURPOSES ONLY. NOLIMITCOINS SOCIAL GAMING PLATFORM DOES NOT OFFER 'REAL-MONEY GAMBLING' OR OPPORUNTIY TO WIN REAL MONEY BASED ON A GAMEPLAY."** (emphasis added). Defendant misleads consumers into believing they are not engaging in real money gambling by wagering Super Coins on the case games it offers on its platform. Plaintiff relied on these representations in playing No Limit Coins.

145.    Defendant further misleads consumers by bundling Gold Coins with Super Coins that have redeemable value, thereby disguising the true nature of its unlawful gambling business model.

146.    Defendant's practices described herein, including the operation of an illegal casino and the sale of Super Coins, are deceptive under N.Y. Gen. Bus. Law § 349 because they contravene New York's public policy against unlawful and unregulated gambling, and caused substantial injury to the consumers who purchased Super Coins.

147.    A reasonable consumer would be misled to believe that Defendant's platform offers genuinely free entertainment without financial risk, when, in fact, the design of the site and its representations are intended to lure consumers into paying money to gamble on its games of chance, all while Defendant purports to be a "social casino" for "amusement purposes only."

148.    Defendant caused substantial injury to Plaintiff and the New York Class by inducing them to purchase and wager Super Coins through the design of its illegal gambling platform. The injury caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably

have avoided.

149.    Defendant's unfair practices occurred during the marketing and sale of Super Coins for use on No Limit Coins' illegal gambling platform, and thus, occurred in the course of trade and commerce.

150.    Further, Defendant represents to consumers, including Plaintiff, that its games are not gambling and you can "play for free." Defendant's homepage also states that it's a "free-to-play social casino" and that its platform is "a play-for-fun website intended for amusement purposes only" to deceive consumers into believing that they are not engaging in gambling by wagering Super Coins on the Chance Games offered on its platform. Defendant repeatedly represents that "no purchase [is] necessary," "24/7 FREE," "100% free, always" and "no strings, no pressure—just log in, play, and enjoy the ride." Plaintiff relied on these representations in playing No Limit Coins.

151.    Further, Defendant conceals from consumers, including Plaintiff and the New York Class, that wagering with Super Coins on its platform constitutes illegal gambling prohibited by state law.

152.    To make matters worse, Defendant disregards the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. Comp. Codes R. & Regs. Tit. 9, § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by the commission that include the

problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (8778-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the commission"); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.2 ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from all New York State licensed gaming facilities"); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements").

153.    Defendant aggressively markets and advertises its platform through various media while at the same time concealing that it is illegal under state law. As such, New York consumers, including Plaintiff and the New York Class, are highly likely to continue to encounter current and future iterations of Defendant's illegal platform absent injunctive relief.

154.    Further, Defendant's conduct is deceptive because it is designed to encourage illegal gambling while marketing its platform as a legal simulation of casino-style games, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

155.    These deceptive practices are material and likely to mislead reasonable consumers,

who are led to believe they are participating in harmless social gaming rather than unlawful, unregulated gambling.

156.     As a direct and proximate result of Defendant's violations of N.Y. Gen. Bus. Law § 349, Plaintiff and the New York Class members have suffered actual injury in the form of loss monies paid to purchase Defendant's coin packages and monies lost wagering Defendant's Super Coins.

157.     Plaintiff, on behalf of herself and the New York Class members, seeks an order requiring Defendant to (1) cease the deceptive practices described herein, (2) return all monies acquired through any purchase that included the transfer of Super Coins to Plaintiff and the New York Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

**THIRD CAUSE OF ACTION**
**Violation of New York General Business Law § 350 (False Advertising)**
***(On behalf of Plaintiff and the New York Class)***

158.     Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–121 by reference as if fully set forth herein.

159.     N.Y. Gen. Bus. Law § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a(1).

160.     Defendant engaged in false advertising by marketing and promoting No Limit Coins as a "free" or "social casino" offering harmless entertainment, when in fact Defendant operates an unlawful online gambling platform that allows players to wager and redeem digital currency for money and prizes.

161.     Defendant disseminates advertisements and marketing materials throughout New York falsely represent its platform as a "free-to-play social casino" that is "100% free, always"

and that "no purchase [is] necessary" to play their games.

162.    Defendant's homepage and digital advertisements repeatedly emphasize "FREE" gameplay and "no strings" participation, while omitting material facts that users must purchase in-game currency to meaningfully participate or access the games of chance.

163.    These representations are objectively false and misleading because Defendant's so-called "free" play is illusory: users receive only minimal non-purchasable credits, and continue play or meaningful participation requires real-money purchases of Super Coins.

164.    Defendant further misrepresents No Limit Coins as a "free-to-play social casino" that is "intended for amusement purposes only," rather than unlicensed online casino. Indeed, Defendant represents to consumers, including Plaintiff and the New York Class, that its platform "DOES NOT OFFER 'REAL-MONEY GAMBLING.'" By doing so, Defendant creates the false impression that its platform is lawful and that consumers are merely engaging in risk-free social gaming rather than illegal gambling.

165.    Defendant's advertisements fail to disclose that the No Limit Coins platform operates in violation of New York law, that consumers are engaging in real-money gambling, and that Super Coins constitute things of value that can be lost while playing Defendant's Chance Games. These omissions are material because they would influence a reasonable consumer's decision to engage with and make purchases on Defendant's platform.

166.    The above-referenced advertising and marketing statements are likely to misled a reasonable consumer acting reasonably under the circumstances into believing that No Limit Coins offers "free," "social," or "amusement" play rather than unlawful gambling with real financial risks.

167.    Defendant's representations are further misleading because the phrase "no purchase necessary" are objectively false and misleading because, in practice, consumers incur costs and must make purchases of Super Coins to meaningfully participate in Defendant's games of chance. The limited free coins provided upon sign-up are quickly exhausted and insufficient to engage in the advertised gameplay. As a result, players are effectively required to buy additional virtual currency to continue playing and to engage in games with redeemable prizes. By conditioning

continued gameplay on the purchase of virtual currency, Defendant's platform renders its "free" and "no purchase necessary" representations materially false and deceptive. The "no purchase necessary" language thus operates as a deceptive disclaimer masking what is, in substances, a pay-to-play gambling enterprise.

168.    Defendant's false advertising was directed at the public at large and occurred in the course of Defendant's business practices within New York.

169.    Defendant aggressively markets its illegal casino platform through targeted advertisements on social media, digital marketing campaigns, and other promotional efforts aimed at attracting New York consumers. These advertisements emphasize free-to-play gaming, large potential winnings, and enticing promotions while concealing the true nature of Defendant's gambling operation.

170.    Defendant's false and misleading advertising deceived Plaintiff and New York Class members, leading them to engage with and make purchases on No Limit Coins under the mistaken belief that they were not participating in illegal gambling.

171.    As a direct and proximate result of Defendant's false advertising, Plaintiff and the New York Class have suffered actual damages in the form of monies paid and lost for Defendant's Super Coins.

172.    Plaintiff, on behalf of herself and the New York Class members, seeks an order requiring Defendant to (1) cease the deceptive practices described herein, (2) return all monies acquired through any purchase that included the transfer of Super Coins to Plaintiff and the New York Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**
***(On behalf of Plaintiff and the New York Class)***

173.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–121 by reference as if fully set forth herein.

174.    Plaintiff and the New York Class members have conferred a benefit upon Defendant in the form of the money they paid for the purchase of Super Coins to wager on Defendant's illegal casino platform.

175.    Defendant appreciates and has knowledge of the benefits conferred upon it by Plaintiff and the New York Class.

176.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the New York Class members, which Defendant has unjustly obtained as a result of its unlawful operation of casino games. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

177.    Accordingly, Plaintiff and the New York Class members seek full disgorgement of all money Defendant has retained as a result of the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1.    For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and her counsel as class counsel;

2.    Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3.    Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4.    Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5.      Awarding pre- and post-judgment interest, as allowable by law;

6.      For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

7.      Declaratory and equitable relief, including restitution and disgorgement;

8.      For public injunctive and declaratory relief as the Court may deem proper; and

9.      Awarding such further and other relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: October 29, 2025                    Respectfully submitted,

/s/ *Vicki J. Maniatis*
Vicki J. Maniatis (NY Bar No. 2578896)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 East 50th Street
New York, NY 10022
Tel.: (516) 491-4665
vmaniatis@milberg.com

Andrew J. Shamis
New York Bar No. 5195185
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299
edwine@shamisgentile.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

Gabriel Mandler*
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Telephone: (786) 673-2405
gabriel@edelsberglaw.com

*Pro hac vice forthcoming*
*Counsel for Plaintiff and the Proposed Class*